### JOHN DEN EX DEM. HENDRICKSON v. ENOCH HENDRICKSON AND OTHERS.

This court will not relieve a defendant in an action of ejectment, from the consequences of a rule to consolidate, though he denies that the rule has been entered by his authority; but the court will leave him to pursue his remedy, if he have any, against the attorney, who has assumed to act in his name, beyond his authority or without any power.

Three suits in ejectment, one against Enoch Hendrickson and Daniel Hendrickson, one against Aaron Emley, and another against Edward Allen, were instituted in this court by the plaintiff. In the term of September 1830, Samuel R. Hamilton, Esquire, appeared for all of the defendants, and obtained a rule to consolidate the actions. Each of the actions was brought for the whole of the premises in controversy. The consent rule in the consolidated form, was drawn up by the attorney of the defendants, and exchanged with the attorney of the plaintiff. The cause was repeatedly noticed for trial and went off either on affidavit or for want of time, until the April Circuit 1833 of Monmouth county, when it was reached on the calender, regularly called on, and the plaintiff non-suited by reason of the defendant's not confessing lease, entry and ouster. In the May term following, a judgment was entered for the plaintiff against the casual ejector. Before the judgment against the casual ejector, Emley and Allen obtained a rule on the plaintiff, to show cause why the consolidation rule should not be vacated and discharged.

The rule to show cause, was argued at the February term last, by *H. W. Green* and *I. H. Williamson,* in support of it; and by *Wall, contra.*

The opinion of the court was delivered at this term, by

RYERSON, J. This is an application to this court, by Edward Allen, one of the above named defendants, to vacate, so far as he is concerned, a rule of this court, consolidating, according to our practice, several actions of ejectment brought prior to the September term of this court, in the year 1830. The consequences of this consolidation, are likely to prove to him very serious, unless he can gain relief in this or some other mode. But I am inclined to believe, he has placed himself in

Hendrickson *v.* Hendrickson and others.

a position, or allowed others to draw him into difficulties, from which we cannot or ought not to relieve him, according to long established principles governing the proceedings of courts of common law. He was regularly sued or proceeded against, as a man wrongfully in possession of the plaintiff's farm. This proceeding, he must be presumed to have known, (for no man is allowed to allege his ignorance of the law as an excuse,) subjected him to a judgment, in effect against himself, unless he appeared and defended the action, not only for the whole farm but ultimately for the intermediate profits. *Baron* v. *Abeel*, 3 *Johns. R.* 481. He made no defence: and moreover says in his affidavit, made to bring this matter before the court; that he intended to make none; that " upon the service of the declaration in ejectment, he was informed by Enoch Hendrickson, (his alleged landlord) that *he* should defend the action in his own name, and that the deponent (Allen) need not employ counsel, or appear to defend said action." He *acted* deliberately then upon advisement, and relied on another person to employ counsel and defend this action. That person employed the attorney who did the act now so much feared and deprecated. How then could Allen say that the attorney acted without authority, express or implied? It may be all very true that the attorney acted in a way not expected by Mr. Allen. That is a totally different matter, with which this plaintiff has nothing to do. It must be adjusted between Allen and Hendrickson and the attorney employed by him. Allen again says in his second affidavit, that " after the service of the writ, I had a conversation with Enoch; he told me I need not bother myself about it, that he would defend the suit himself." Moreover he tells us, that Enoch obtained the possession of the declaration served on Allen, it must be presumed with his full consent, and for the purpose of the defence which Allen expected Enoch to make, as he Allen, does not pretend to the contrary. This was giving him the means to gain confidence with any of the attornies of this court, that he was authorised to act for Allen. But this is not all. Only a few days before this action was brought, Enoch Hendrickson, accompanied by Allen and Emley, who had also obtained a wrongful possession of a part of the premises,

went from Monmouth all the way to Trenton, and thence to Flemington, to consult this same attorney; and there we find them all employed, under the advice of the attorney, in executing a scheme to defeat the very action brought against Allen, almost immediately after, if not then already commenced. It does appear to me, that this presents such a strong foundation on which to raise the presumption, that the attorney was fully authorised by Allen, to act for him, that it is not possible for Allen to escape from the consequences, when the rights of third persons are involved. That this authority was not personally communicated, is not very material. And when the attorney denies that he was employed, or authorised by Allen to appear for him in the action he must be understood to have reference to a personal application. That he at the time supposed Enoch Hendrickson fully possessed the confidence of Allen, and was fully authorised to act for him, in such manner as counsel should advise, respecting the action against the latter, is manifest from the steps by him taken in the cause. And it not only appears that Allen rested easy under the promise of defence and indemnity which Enoch had given him, but when distinctly informed in April 1831, that he was a party on the record, he paid no attention to it. This information was given him by the lessor of the plaintiff, on the authority of his attorney. True, he says he did not believe the information, and that the attorney of the defendants told him it was not true. If the attorney of defendants did so say, it is one of the *strangest* things in this singularly conducted cause. But suppose he did so say, why should he be credited rather than the other attorney? He ought at least to have been put on further enquiry. He received the information at the Circuit, where the cause then stood for trial, and, in which, he said he was subpœnied as a witness, and yet he would not take the trouble of further enquiry, when the Clerk of the court where he was attending, could have disclosed to him the exact truth. The facts I have thus far stated, are derived from the defendant himself. The interest which he has in the question, is such that it cannot be supposed he would give any coloring to his deposition, unfavorable, at once, to truth and the application

Hendrickson *v.* Hendrickson and others.

before the court. But there is another important fact disclosed to us, partly by himself, and partly through another channel: That is, shortly before the Circuit, he was served with a notice regularly entitled in this cause, and addressed to him as a party, to produce a certain paper to be read in evidence. This he says he mistook for a subpœna. But still it would inform him of the fact of his being a party, if he read it or heard it read. And although we receive his statement as entirely candid and true, that the plaintiff dealt with him before and on the first day of the Circuit, as a witness in the cause, yet he admits that on the second day of the court, he was otherwise informed, and that he could not be a witness, for the very reason that he was a party; and this, told to him by the plaintiff himself, on the authority of his attorney, as before stated.

After this information, he remained still for more than fifteen months, and this action in that time repeatedly carried down for trial, into his own county, and for different reasons postponed; without coming before this court to assert the want of authority in the attorney, the ground on which this application is rested. To yield to his application under such circumstances, would, it seems to me, be going beyond any decided case of which I have any knowledge; but also overturning our long settled practice and introducing a precedent involving us in perplexities, the consequences and termination of which, it is impossible to foresee. And it seems to me, it would be losing sight of another matter, " that there is " (in the language of C. J. KENT) " another party in the cause, equally entitled to our protection." 6 *Johns.* 296, *Denton* v. *Norris.* The confidence placed by courts of law, in their attornies, is very great. When a man commences an action in this court, and an appearance thereto is proffered by one of our attornies, we never question his authority to appear. But that is not all, it is not usual for the plaintiff to be allowed to question it; and it must, as I apprehend, be under very special circumstances, if we would permit it. The plaintiff in this case was under the necessity of accepting the acts of the attorney, and this application was not made till two years had elapsed. Would we not then essentially endanger the rights not only of this, but of all other plaintiffs, now to interpose and

set aside these proceedings? The ancient authorities on this subject, are supposed to be impaired if not overthrown in England and New York, by the case above referred to, and that of *Robson* v. *Eaton,* 1 *Term R.* 62. But it must be remembered that in those cases, the party complaining, had no kind of notice, of the pendency of any proceedings in court, which could involve his rights, and he sought relief as soon as informed that he was implicated. When such a case shall arise here it will be time enough to enquire after and apply the proper remedy. In this case, the party should be left to pursue his remedy, if he have any, against the attorney who has assumed to act in his name, *beyond* his authority, or without *any* authority at all.

There are besides, some other striking features in this case, though I do not think proper at present to build any opinion thereon. Allen was the tenant of this whole farm, under the lessor of the plaintiff. By his own admission, he commenced a negotiation for a new lease, of a part of it, before his time had expired, not with his landlord the owner thereof, but with a stranger, this same Enoch Hendrickson who, he knew, had no title, and no pretence of title, but a bid at Sheriffs' sale, the terms of which he was *unable* to comply with, and which Allen himself did not expect he would fulfil. He then moves off the premises, accepts a parol lease of this same Enoch Hendrickson, for the part; makes a surrender, wearing very much the aspect of mere sham, but returns into the possession to gather his crops; having arranged in the mean time as he supposes, to shift the defence of this action, and the liability to respond for his enjoyment of the premises, upon Enoch Hendrickson an irresponsible person. This is such evidence of collusion, as united, to the facts before referred to, leaves him little claim on my commisseration.

My conclusion is, that the rule to show cause should be discharged.

FORD, J. concurred.

HORNBLOWER, C. J. Allen, one of the defendants in this case, had been in possession of a farm, the premises in question as a tenant, under the lessor of the plaintiff in this cause, for

one year, which ended on the first of April 1830. About the first of August 1830, the plaintiff instituted three suits in ejectment; one against Enoch Hendrickson and Daniel Hendrickson; one against Aaron Emly; and another against Edward Allen. Each of these ejectments was brought for the whole farm in September term 1830, Samuel R. Hamilton, Esquire, an attorney of this court, appeared for all the defendants, and moved for a rule to consolidate the actions, which was granted to him, upon the terms specified in the case of *Den* v. *Kimble* 4 *Halst.* 335, 8. The attorney for the defendants, thereupon drew up the consent rule in the consolidated form, and exchanged it with the plaintiff's attorney, but omitted or neglected to enter the rule for consolidation, as had been directed by the court. At a subsequent period, the plaintiff's attorney having discovered this omission, entered or procured to be entered the consolidation rule in proper form. After this, the cause was repeatedly noticed for trial at the Circuit, by notices regularly served on Mr. Hamilton, who uniformly appeared and responded thereto as the attorney for the defendants. The cause was sometimes put off on affidavits, and other times went off for want of time, until the April Circuit 1833, when it was reached on the calender, regularly called on, and the plaintiff non-suited by reason of the defendant's not confessing lease, entry and ouster. In the May term following, a judgment was consequently entered for the plaintiff against the casual ejector. The plaintiff thereupon took possession by the proper execution, and commenced an action against all of the defendants, for the mesne profits; which is now pending in this court.

In September term 1832, which was before the judgment against the casual ejector, upon motion in behalf of Emely and Allen, supported by affidavits, a rule was granted calling on the plaintiff to show cause why the consolidation rule which had been made and entered as aforesaid, should not be vacated and discharged. Emley has since died, and Allen is now seeking to have the rule to show cause, made absolute, so far as respects him.

The case is not free from embarrassments. It has been ably argued by counsel, both on the facts and the law, and a great

many authorities ancient and modern, submitted to the notice and consideration of the court. I will endeavor

1st, To ascertain the facts; and then if they present a case entitling the defendant Allen, to the sympathies of the court, consider

2d, Whether we have the power to relieve him?

First as to the facts:—If we reject the affidavits made by Allen the authority to appear for him, will depend on what Mr. Hamilton himself has stated; or else it must be inferred from the circumstance of the notice served upon Allen, and spoken of in the affidavit of Mr. Wall.

But Mr. Hamilton disclaims under oath, any authority from Allen, to appear or act for him in the matter. He says that Enoch Hendrickson called on him, and stated that three eject‑ments had been commenced; that " *he alone claimed title and should make defence,*" and that upon " *these instructions,* he entered the appearance, and applied for the consolidation rule." Why Mr. Hamilton did so, it is difficult to imagine. If Enoch Hendrickson told him, that " he *alone* claimed title, and should make defence, it surely conferred no authority on Mr. Hamilton to appear for Allen, or for any one else. He should have appeared for Hendrickson *alone*, and asserted *his* title. If there were no other evidences in the case, the conclusion would be irresistable, that Allen has been improperly involved in this suit. But it appears by the affidavit of Mr. Wall, that previous to the Monmouth April Circuit, 1831, he caused a notice to be served on Allen, in which he was named as one of the defend‑ants, in the title of the cause prefixed to the notice, and which was addressed to him, at the foot of it, by the name of " *Mr. Edward Allen one of the defendants,*" requiring him to produce at the trial, a certain lease, and that he did attend at the Circuit and produce the paper, in pursuance of the notice. This, it is insisted, was a recognition by him, that he was a co‑defendant in the cause; or at least, a notice to him *then*, that he was such defendant, if he did not know it before; and that he ought at that time to have apprised the plaintiff, of the error, instead of laying by, and suffering him to proceed in the cause. This argument however, proceeds on the assumption that the

notice was read to, or by Allen, and that he had sufficient legal intelligence to understand from its terms, that he was a *joint* defendant with the Hendricksons and Emley, and subjected to all the consequences of a consolidation rule. I should hardly be willing to fasten a serious liability upon any man unacquainted with legal forms, from the mere fact, that *such* a notice had been served upon him. It is not every man in society that understands the forms and technicalities of a proceeding in ejectment; and much less are they familiar with the effect of a consolidation rule, or a joint action of that kind. Allen had in fact, been served with an ejectment; he knew he had been made a defendant in a suit against himself. He might therefore have read the notice and understood enough of it to know that he was required to produce a certain paper, without knowing, from the manner in which his name was associated with the other defendants in the caption of the notice, that the suit against him, had been *consolidated*, and he rendered thereby *jointly* responsible for costs and mesne profits. None but a lawyer could fairly be presumed to know that. When therefore the attorney on the record, expressly denies any authority to appear for the defendant—when he discloses the instructions that he did receive from *his* client, and those instructions include no claim or pretence of any title in Allen, or of any intention on his part to defend the suit, I think it would be going very far to decide, as a matter of fact, that Allen *did authorise* the attorney to appear for him, or that he knew of, or consented to the consolidation rule, from the mere circumstance of the notice sent to him by Mr. Wall, and in my opinion it would be equally extravagant to consider him so far apprised by that notice, of his peculiar relation to the cause, as to subject him to the consequences of laches.

But whatever conclusion we may come to, if the case rested upon the ground already noticed, I think we must be satisfied that Allen's name has been improperly used, if his own affidavits are to be believed. These affidavits were at first objected to, by the plaintiff's counsel; but the objection was afterwards waived, and they were read by consent. In the one made on the 3d of September, 1832, Allen states, that Enoch Hendrickson

told him, that he should defend the action, *in his own name*, and that he need not employ counsel or appear to defend the action. He states his entire ignorance of the fact, that his name had been used as a defendant in the cause—that it had been so used without his authority, knowledge or consent. He disclaims all pretence of right or title to any part of the premises: declares that he never intended to appear to the suit, or to make any defence thereto, in any shape whatever, and denies unequivocally, that Mr. Hamilton was his attorney in the cause. In his affidavit made on the 9th of October 1832, Allen reiterates and more fully declares, that he never at any time employed any attorney or counsel in the cause, until he employed Mr. Green to make this application; that he never spoke to Mr. Hamilton himself, and never authorized Enoch Hendrickson or any one else, to retain or employ counsel for him, in the cause, and again denies that he ever intended to appear to, or make any defence in the suit. Unless therefore Allen is twice perjured, the use of his name as a defendant in the suit, was altogether unknown to, and unauthorised by him. Then, as to the notice sent to him by the plaintiff's attorney, he either took it for a subpœna, or he has perjured himself again; for he states in his affidavit, that he was *subpœnaed* as a witness for the lessor of the plaintiff—that he attended as such; that he was paid his fees as a witness, and that the plaintiff gave him his dinner while attending the court. He admits, it is true, that after Joseph Hendrickson got the lease from him, he told him, he might go home; that Mr. Wall said he was one of the parties, and could not be a witness: But he says under oath, he did not believe he was a party, he thought it must be a mistake, and he immediately appealed to Mr. Hamilton, who, he knew was Enoch Hendrickson's attorney, and that Mr. Hamilton told him he *was not* a party. I am inclined, therefore, to think that Allen did not then know or believe that he was a party on the record, and that he rested in that belief, until shortly before he made his application, as stated in his affidavits. Allen no doubt delivered the declaration served on him, to Enoch Hendrickson, and he was right in doing so if he considered him his landlord in respect of any part of the premises;

Hendrickson *v.* Hendrickson and others.

but that did not authorise Enoch to use his name. A landlord has no right to make his tenant a defendant in ejectment, without his consent—and Allen expressly denies under oath, that he ever gave any such consent. I am compelled, therefore, to believe upon a careful examination of all the facts, that Allen has been joined in the defence of this suit, improperly, and without his design, knowledge or consent. His conduct in relation to Joseph Hendrickson, his original landlord, may have been improper and reprehensible, but we must not undertake to punish him for it, by making him defend for the whole farm or any part of it, against his will.

It remains however to be considered, 2ndly, whether the court can now relieve him?

T e general principle, that no man can *bind* another in any contract or obligation, affecting in the slightest degree, his person, his property or his will, without his consent, is so familiar with every man, that it seems to me, this question would create surprise, even at the bar, if now put for the first time. To the community at large, it must be a startling one; and I cannot suppress the belief that if they were apprised it was now a grave question before us, whether any licensed attorney of this court, might not appear for a man without his knowledge or consent, and by mismanagement or design, conclude his rights, and subject his person to imprisonment, his character to infamy, his property to execution, and his family to ruin, it would produce an excitement, that would shake the very pillars of this temple. Such, however, in effect, is the question involved in this case, and I do not regret the opportunity it affords me of expressing my views in relation to it. In doing so, however, I have only to refer to what was said by the late Justice VAN NESS, in the case of *Denton* v. *Noyes*, 6 *Johns. R.* 296. He dissented, it is true, from the majority of the court; but I fully subscribe to the sentiments expressed by him; and were I to attempt to give my reasons for the opinion I entertain upon this subject, I could not do it better, than by transcribing the whole of his able argument. In that case, all the leading authorities are collected, and need not therefore be cited by me—they were critically examined and reviewed by that learned Judge,

and the result shows "that this question is not so settled" by the old authorities, as "to preclude us from establishing such a rule as shall be deemed the *most* just, and the *least* objectionable." If however the cases cited from the year book and other ancient reports, sustained without qualification or exception, the extraordinary rule that the authority of an attorney, cannot be enquired into, either by the adverse party, or by the person for whom he has undertaken to prosecute or defend, yet I do not know that we would be bound implicitly, to adopt it. It cannot be considered, as one of those rules of the common law, founded upon immutable principles, or which lie at the foundation of settled doctrines, regulating the rights of property and the administration of justice—to which, the court has no right to apply its modifying hand. On the contrary, it may rather be viewed as a question of practice, incidentally arising in the prosecution of suits, and relating to the conduct of the officers of the court, over whom the court may exercise a control for the protection of its suitors—or at least it is one of those rules which require to be modified, in order to meet the ever varying circumstances of society. Whatever reasons might have existed in former days, to justify such a rule, it is in my opinion, inconsistent with the spirit of the times and the institutions of our country. Neither the bar, nor the community, at this day, would submit to the practical effect of the rule as it is laid down in some of the cases usually cited in support of it. In 1 *Salk.* 88, *S. C.* 6 *Mod.* 16, and in some other cases it is said, the court will not interfere, unless the attorney is of "suspicious character or circumstances." Such a criterion might have answered in the time of the year books, and even as late as Lord Holt's day; but woe betide the Judge, who in this country, and at this day, should look around the bar, though he should do it in all the honesty of his heart, and mark out the attorney, who had been weighed in the scales of judicial opinion, and found wanting either in integrity of purpose or ability to respond—a scrutiny so invidious, and a comparison so odious, would never be made at this bar, I am persuaded; and yet if the law is so, it must be made, or justice must fail. But it is unnecessary to follow out the practical consequences of

Hendrickson v. Hendrickson and others.

the doctrine contended for, even if it could be carried into effect. They lie on the surface, and are obvious to the most superficial observer.

I have already intimated my doubts, whether the rule contended for, was at any period, entitled to be considered as the settled doctrine in the English courts. Van Ness, Justice, in the case of *Denton* v. *Noyes*, 6 *Johns. R.* 311, has cited several cases, anterior to the American revolution, in which a contrary practice was adopted—and the case of *Dobson* v. *Eaton*, 1 *T. R.* 62, though not authority here, seems to show either that the court of King's Bench in 1785, did not recognize the doctrine of the old books, to be as has been supposed, or considered it a matter within the sound discretion of the court. In that case, the attorney on record for the plaintiff, commenced the action at the instance of a third person, who showed him a power of attorney, from the plaintiff, authorising him to collect a debt, but which afterwards proved to be a forgery. The defendant admitting his indebtedness, paid the money into court; the attorney for the plaintiff took it out, and gave it to the man who retained him. The creditor whose name had been thus used without his knowledge or consent, afterwards brought his action for the same debt; and the court held that the plaintiff was not precluded from recovering the money. This is in direct opposition to the case of *Shepard and al.* v. *Orchard in* 6 *Mod.* 40, in which it was held that a plaintiff whose name had been improperly used by an attorney, was equally bound, with a defendant under similar circumstances. This case cannot be distinguished in principle, from those cited on the other side; nor can any reason be assigned, why a plaintiff whose rights have been compromitted by an unauthorized agent, should not be bound by his acts, as much as a defendant. In *Doe* v. *Filis*, 2 *Chitt. R.* 170 the court set aside a verdict in ejectment, on the ground that the lessors of the plaintiff, had never authorised the use of their names; and in *Doe* v. *Roe*, 2 *Chitt.* 171, the court ordered the name of one of the lessors of the plaintiff, to be stricken out, because it had been inserted without his consent. These are, also, modern cases, but they show that the courts in England, will not refuse to enquire into

the authority of the attorney. To revert for a moment to the case of *Denton* v. *Noyes*, 6 *Johns. R.* 396, it is open to the remark, that although the majority of the court considered the rule " to be settled upon *too much authority* to be denied, and upon *too much principle* to be disturbed," yet they undertake to modify it so as to " disarm " it of its " severity," by retaining the judgment as a security, and giving the defendant a trial on the merits. This was perhaps a prudent course under the circumstances of that case; but then I apprehend in doing so, they virtually repealed the rule. If on the trial of the merits, a verdict had been for the defendant, what would the court have done? Certainly they would have set aside the judgment, notwithstanding the rule ; otherwise the trial would have been but a mockery.

In the very next case to the one last cited from 6 *Johns. R.* 311, I mean that of *The People* v. *Bradt*, 6 *Johns. R.* 318— the Supreme Court of New York, discharged a person from an attachment, for not paying the costs of an ejectment suit, to which he had been made a party, by an attorney of that court, without his consent. This in principle was precisely like the case before us.

In *Crutchfield* v. *Porter*, *Hammond's Rep.* 578, it was solemnly adjudged by the Supreme Court of Ohio, that a party is not bound by the acts of an attorney who appears for him without authority. It has been so decided in the Court of Appeals of the State of Kentucky, in *Handley* v. *Statelor*, 6 *Little's R.* 186.

The reason assigned for the rule in the old authorities is, " that as the attorney is a sworn officer of the court, he is himself responsible to the person for whom he appears, and as the opposite party is in *no fault*, and has no adequate means of ascertaining the authority of the attorney, he ought not to be delayed or injured by the unauthorized act of such attorney, if he is of *sufficient ability to respond* in damages, to the person for whom he undertook to appear." This is undoubtedly the argument on which the old decisions are founded; but who can read it without being struck with its weakness and fallacy ? " The opposite party is in *no* fault,"—but is the man whose

Hendrickson *v.* Hendrickson and others.

name is used without his knowledge or consent, in *any* "fault?" Again, " he has no adequate means of ascertaining the authority of the attorney." But, has the party who does not know that his name is on record, any better means of detecting and exposing the mistake or mal-practice? Why then should he be turned over to the forlorn hope of recovering in damages against the attorney, to repair, it may be, his ruined fortune and blighted prospects? I am at entire loss for an answer. The attorney may be liable to him, but if the attorney has unlawfully interfered in the suit, to the injury of the adverse party, he is equally liable to him. To say the most of it, the parties were equally blameless; and *in pari conditione*, the loss must rest on him upon whom it has fallen. If a man deals with another, believing him to be my accredited agent, when he is not, it is his misfortune, not mine. But the reasoning in the old authorities, say the Supreme Court of Ohio, however plausible, " do not furnish any sufficient ground, why one of the most obvious and well settled principles of law, as well as justice, should be departed from; that no person is to be bound by the act of a stranger, in whom he has vested no authority, nor reposed any confidence, and over whom he can exercise no control,"—and they add that " although it is not the practice of our courts in ordinary cases, to require the attorney to produce either a warrant or other authority from the suitor, before he is permitted to appear; yet its production may be, and under certain circumstances undoubtedly would be, required by the court." So I think; and I see no danger nor difficulty in the rule, that attorneys must take each others appearances, at their peril. If they have any reason to question the authority, they may call for it, and upon a proper case stated, the court, if necessary, would require its production.

Upon the whole, I am of opinion, the rule to show cause in this case, ought to be made absolute. I see nothing in the case that ought to subject the defendant, Allen, to all the consequences incident to a joint defence in this suit, and ultimately to an action for the mesne profits. The plaintiff has not been injured by the circumstances of Allen's name being used. He is as to time, in the same situation he would have been in, if

Enoch had defended alone; and if it was otherwise, we would have no right to visit the plaintiff's misfortunes upon Allen.— If either party must suffer, it ought to be the one who knew the state of the case, and might have ascertained whether all was right. If an attorney appears for me without my knowledge or consent, I am not to blame. In such case, I repose no confidence in the attorney: If the plaintiff does, and proceeds in the cause upon the faith of the attorney, he should be the victim and not I.

It is suggested, however, that if the consolidation rule is discharged, the consent rule will fall of course; and then the non-suit at the circuit, and the consequent judgment by default, will be irregular. But this consequence need not follow. The plaintiff is now in possession, let him proceed in his action for the mesne profits, in the suit as it now stands, upon his stipulating not to take out execution against Allen. If he refuses to do this, the rule should be made absolute, unconditionally. But the plaintiff to be at liberty to enter judgment *nunc pro tunc*, against the casual ejector, in the suit against Allen, and to have costs of that suit.

*Rule discharged.*

CITED in *Jones* v. *McKelway*, 2 *Harr.* 346; *Hale* v. *Lawrence*, 2 *Zab.* 87; *Gifford* v. *Thorn*, 1 *Stockt.* 723; *Ward* v. *Price*, 1 *Dutch.* 229.